June 19, 1865.

---

## SUPREME COURT—IN ADMIRALTY.

---

### ASEGUT *et al. vs.* KING *et als.*

Subject to modification by special contract, owners of vessels, employed as common carriers in this Kingdom, are to be held answerable for the loss or damage of all property shipped for transportation on board of such vessels, unless it shall appear that such loss or damage resulted from unavoidable accident, i. e., the act of God, or the act of a public enemy.

In ordinary cases, the law does not require the adoption of extraordinary measures of precaution ; and the master having managed his vessel in what was shown to be the usual proper and seamanlike manner, under the circumstances, was held to have done all that could be required of him, although the vessel and cargo became a total loss.

On appeal from the decision of Justice DAVIS.

Justice ROBERTSON delivered the judgment of the majority of the Court as follows :

This is a suit brought by the libellants, Edward Asegut and Julius Reinhardt, against the respondents, James C. King, William L. Green and Frank Molteno, on the instance side of the Court, in which the libellants claim to recover from the re-

spondents, the value of 600 kegs of sugar and 70 barrels of molasses, shipped by the libellants in the month of January, 1864, on board of the schooner "Emma Rooke," the vessel of the respondents, which was wrecked at Honoipu, Hawaii, on her passage to Honolulu, and with her cargo totally lost.

The suit was originally brought before Mr. Justice DAVIS, who gave judgment in favor of the libellants, for the sum of $4,574 08½, from which judgment the respondents appealed to the full Court.

In the adjudication of this cause, two questions are presented for the decision of the Court, viz : firstly, as to the legal rules by which the case must be governed, and, secondly, whether or not the respondents, under the law as declared by the Court, should be held responsible for the loss of the libellants' property.

The common law of England, in relation to the duties and obligations of common carriers, which is the subject involved in this case, has never been formally adopted as the law of this Kingdom, either by legislative enactment or by judicial adoption. It is argued therefore, on behalf of the respondents, that now, when the Court is called upon for the first time to declare the legal rule of responsibility which is to govern and measure the liability of common carriers in this country, we ought not, upon considerations of public policy, to adopt the strict rules of the English common law, but rather some rule more favorable to the ship-owner, based upon the principles of the civil law and the marine ordinances of France, limiting the liability of the ship-owner similarly to the modern commercial laws of Great Britain and the United States of America.

After due deliberation, we have formed an opinion adverse to the view thus contended for. In our opinion, it is wiser for the court to adhere to the rules of the common law of England, the beneficial working of which has been so long tested and exemplified in the traffic of the two greatest commercial States of the world. We accordingly adopt and declare the rule, subject however to modification by special contract between the parties, that the owners of vessels employed as common carriers in this Kingdom, are to be held answerable for the loss or damage of all property shipped for transportation on board

of such vessels, unless it shall appear that such loss or damage resulted from unavoidable accident, *i. e.*, the act of God, or the act of a public enemy.

Having thus declared the law applicable to the case, we will now proceed to consider whether or not, upon the evidence, the respondents should be held legally liable for the loss of the libellants' property. The main facts of the case will be found carefully and clearly stated in the decision rendered by Judge DAVIS, and we need not repeat them at length. The vessel arrived at the landing at Honoipu, which is formed by an indentation on the coast of Hawaii, about 2 o'clock, A. M., and was made fast to the buoy as is usual, her jib being hauled down and the peaks of her mainsail and foresail lowered. She remained there all the morning, or till near 9 o'clock, A. M. While she lay there the wind was off the land, somewhere from the East to the East-South-East, as the trade winds, which usually blow from about Northeast, do not as a general rule set down till after 10 o'clock, A. M. The weather was good and the breeze moderate. Nearly due North from the buoy there is a point or shoal, at a distance of 104 fathoms, with some rocks merely washed by the water setting out from the point, to within 90 fathoms of the buoy ; nearly South-South-West from the buoy is the opposite point of land, at a distance of about 200 fathoms from the buoy, with deep water close up to the shore. Under these circumstances, Capt. Berrill, in getting his vessel under way, determined to cant her bow off to the starboard hand, towards the Southern portion of land, as being the most feasible course of putting to sea. Accordingly the main-boom was guyed to starboard, and the fore-boom to the port side, the helm being put hard-a-port. As soon as the hawser was let go and the vessel's head took the desired direction, the master ordered the jib to be hoisted and the sheet hauled to windward, in order to turn the vessel round to seaward, the peak of the mainsail remaining lowered. When the jib had been partially hoisted, the vessel was struck by a sudden flaw or gust of wind, which caught the jib and fouled it over the lee anchor-stock, so that it could not be got up, nor the sheet hauled to windward as desired, and instead of turning the vessel's head round, the jib, according to the testimony of the witnesses, helped to urge

the vessel forward on the wind towards the Southern shore. The main sheet was then slacked off to the utmost, and seeing the danger of running on shore, the master let go the halliards of the mainsail and endeavored to get it down, but it stuck against the starboard main rigging. The jib was finally got up, but too late to prevent the vessel from striking, which she did at a point nearly due South from the buoy, and within ten minutes after she had been got under way.

The allegation of the libel is, that the loss of the vessel and cargo resulted from the negligent and unseamanlike manner in which the vessel's sails and rudder were managed, and was in no sense the result of unavoidable accident; and before the libellants can recover, it is necessary that they shall have proved this allegation to the satisfaction of the Court.

After carefully examining and weighing all the evidence, we fail to see that the libellants have made out their case by the proofs. On the contrary, we are of the opinion that, in view of all the circumstances of the case—the early hour of the day, the course of the wind, the greater relative distance of the South point than the North point, from the place where the vessel lay, the fineness of the weather and steadiness of the breeze, as averred and proved by both parties—the weight of evidence shows satisfactorily that the course adopted by Captain Berrill, in attempting to put to sea, was usual, prudent, and seaman-like; and that the fouling of the jib by a sudden and unexpected flaw or puff of wind, preventing the setting of that sail in a seasonable and proper manner, which caused the disaster to the vessel, was one of those occurrences which are usually classed under the head of unavoidable accidents, and styled in legal phraseology the act of God.

Many cases have been cited by the learned counsel in their argument of the cause, and some of them are not essentially different from the case before us. In the old case of Amies *vs.* Stephens, (1 Str. 128) where the master of a hoy attempted to shoot a bridge on the River Thames, but by a sudden gust of wind the hoy was driven on to one of the piers and lost. The decision of the Court was in favor of the defendant, the Lord Chief Justice Pratt, stating that if the hoyman had attempted to shoot the bridge when the bent of the weather was tempestuous,

and the hoy had been lost, he would have been held responsible. In the case of Colt and Colt *vs.* McMechen, (6 Johnson's R., p. 159,) a sloop beating up the Hudson River against a head wind, ran aground through a sudden failure of the wind, near the highlands. In that case the verdict of the jury was in favor of the defendant, and, upon motion for a new trial, the Supreme Court of New York refused to grant it. In our opinion, the circumstances of the case at bar are far more favorable for the respondents, than those of the case just referred to were for the defendant.

It is argued that the respondents should be held responsible, on the ground that the striking of the vessel on the South point might have been prevented by the adoption of a different course of putting to sea from that which was pursued. It is said that, before casting off from the buoy, the master might have caused both the mainsail and foresail to be lowered down, and, as the wind was blowing off the land, the vessel would have drifted safely out to sea. But there is no evidence tending to show that such a course is usual, or that, under the circumstances, it could be considered seaman-like; on the contrary, the proof is, that such a proceeding would have been unusual and unseaman-like. Again, it is said, the line or hawser, which held the vessel to the buoy, might have have been taken from the bow and made fast at the taffrail, so as to have allowed the vessel's head to swing out to seaward, before starting; but there is no evidence before us that such a precaution is ever resorted to by vessels leaving Honoipu, or that such a course is usual or necessary, under circumstances equally favorable with those which existed in the present instance.

As we understand the law, the question is not whether the striking of the vessel could have been prevented by the exercise of extreme caution, or by some mode of proceeding which the ingenuity of man might have devised. Such a doctrine would be unreasonable, impracticable of application, and unsustained by legal authority. The master of the "Emma Rooke" having done that which, under the ordinary and favorable circumstances in which the vessel was placed, is shown by the evidence to be usual, proper, and seamanlike, we are of the opinion that he did all that could be required of him; and that the law

does not require, in any ordinary case, the adoption of extraordinary measures of precaution.

Our decision therefore is that the judgment below should be reversed.   Let judgment be entered in favor of the respondents.

C. C. Harris, Esq., for libellants.

Messrs. Stanley and Montgomery for respondents.

June 3, 1865.

Dissenting opinion of Justice DAVIS, on the merits.

This is a suit brought by the plaintiffs, proprietors of a certain plantation in the district of Hilo, Island of Hawaii, known as the Kaiwiki Plantation, on the Admiralty side of this Court, to recover from the defendants, lately owners of a certain schooner called the "Emma Rooke," the value of 600 kegs of sugar and 70 barrels of molasses, alleged to have been utterly lost upon said schooner by her being wrecked.

The lading of the sugar and molasses on board is admitted in the answer.   The circumstances of the wreck as gathered from the testimony appear to the Court as follows :

The "Emma Rooke" left the port of Hilo on the 19th of January last, and without touching at any intermediate port, arrived at a place named Honoipu, on the coast of Kohala, Hawaii, early the following morning, made fast to a buoy till near nine A. M., when she cast off, with some portion of her sails set, and within ten minutes thereafter struck upon the rocks to the southward, soon after becoming a total wreck.   A disaster so sudden makes all the incidents of anchorage, wind, weather, distances as well as the management of the vessel and the character of the vessel itself, of binding importance in the proper adjudication of the case.

As to the locality, it will be seen from the plan or chart made by Capt. Berrill, and submitted in evidence, that Honoipu is at or near the northwest point of Hawaii ; that it is an indentation of the coast, more like an open roadstead than a harbor or bay, opening wide to the westward.

According to Capt. McGregor, a witness for the respondents, and who assisted Capt. Berrill in making the survey, the usual

anchorage is close to the buoy, distant from the South point 200 fathoms; but that from the buoy to the nearest shoal to the northward is 104 fathoms, a lot of small rocks, extending from North point merely washed with the water, distant from buoy 90 fathoms. Towards the South point the water is deep to near the shore. He says, he has run many times close to South point in the steamer "Kilauea;" from his statement, it seems the prevailing wind in the morning is off shore, square from the land till about 10 or 11 o'clock A. M., when the trades come down, not generally farther to the North than East-North East over the land. But that the wind is more to the Southward in winter, than any other season, on account of the unsteadiness of the trade winds. "The trade wind in the morning comes down in puffs" till about 10 or 11 o'clock A. M. As Capt. McGregor's statements in this regard are not materially varied, if any, by the other witnesses, and on account of his intimate acquaintance from frequent visits, with the place, I have relied in regard to the winds upon his statements. On the morning of the disaster, none of the witnesses testify that the weather was tempestuous, or the sea rough, or the wind blowing from an unusual quarter; but on the contrary, Capt. Worth states that the weather was good, the usual weather of that region, the ocean not rough. In this, he is corroborated by Makahi, a native seaman on board. Mr. Fisher, the mate, also says, that on leaving the buoy the wind was light and blowing off shore, but increased until they got on shore. Captain Berrill himself states that the wind was off shore, blowing from a point about East-South-East. Now as to the manner in which the vessel was attempted to be put to sea, which is undoubtedly the material question at issue, yet more or less affected by facts to be deduced from other important features of the case, having a bearing upon the main point, I do not propose to follow the entire nautical analysis, made out by the experts, by men whose business from early life has been, either in square rigged or fore and aft vessels, to follow the sea. I must determine, whether from the light they have bestowed, it may be fairly inferred (the state of the winds, weather or of any other facts of a similar character being established to my satisfaction) that

there was any lack of that prudence, skill or caution on the part of the master, as to make out the essential ingredient of the plaintiffs' case, to be ascertained by the rules of law, as applied by courts of justice to cases of a like nature. It is contended for the respondents, that the management of the sails and rudder, under the circumstances, was just what it should have been, and that the catastrophe was the result of a fortuity against which they could not guard, or in other words that the misfortune was inevitable. As before remarked, I do not discover from the testimony of the witnesses present on the occasion, any material discrepancy as to the wind or weather on the morning in question, when the vessel was cast off from the buoy to be got under weigh, and I proceed at once to examine the evidence, as to the manner in which she was endeavored to be put to sea. Witnesses agree that the foresail and mainsail were up. Berrill says that on casting off from the buoy the main-peak was down ; Worth cannot say whether it was down or not ; Fisher is of opinion it was never raised at all, although he is not positive as to the exact position of the after sail, as he was occupied forward ; Makahi says, the peaks of both sails were slack. From Capt. Berrill's and Fisher's statements, it furthermore appears that the fore-boom was guyed to port and the main to starboard ; peak of foresail up, wind being favorable for canting vessel's head to Southward, the helm being put hard to port ; that the vessel canted, the order to hoist the jib given, and while the order was being obeyed, the jib was blown over by a gust or puff of wind, and caught over the lee anchor stock, and before it could be cleared and fully hoisted, the vessel struck. As to this mode of getting under weigh, there seems to be some difference of opinion among the experts examined at the hearing. Capt. McGregor, a seaman of long experience, both in square-rigged and fore and aft vessels, lays down the same mode, had he been in command of such a vessel at the time, as that adopted by Capt. Berrill, and says he should not have had the slightest apprehension, but that the vessel would have cleared the land. Capt. Worth, although an old sailor, yet not familiar with schooner sailing, would have hauled the fore-boom to starboard side and the mainsail to port side ; as to the placing of the helm and time of

hoisting jib, it being the intention of the master to cast her head off shore, he does not differ from Berrill, McGregor and Fisher. But his recollection is, that the foresail was on the starboard side, as he would have placed it. Makahi, a native seamen on board and accustomed to sailing in the coasting vessels, and at one time a mate or second mate on board of the schooner "Liholiho," also testifies that at casting off, the mainsail was guyed over to starboard side and foresail to port side, and that the jib was hoisted when the line was cast off; that it was got half way up, became foul; that it was cleared, they hauled again upon it, and before it was quite up, the Captain ordered the jib sheet to be hauled over to windward, which order was immediately followed by another to let go the fore guy; the foresail then went over to the starboard side, and both mainsail and foresail filled, and urged the vessel ahead rapidly. He goes on to state also his experience, derived from service in other schooners, as to the most approved and safest method of getting under way from the buoy at Honoipu, as being in many respects the opposite of what was here adopted, to which it is not perhaps necessary more particularly to advert. He agrees also that the distance to South point was very short, for a vessel of the length and speed of the "Emma Rooke," to run in, after once being fairly under headway, so much so, that according to him, no sails were let down before she struck; that it was attempted to lower the mainsail, but that it became fast to the main rigging, and did not come down; that the vessel went ashore, as the phrase is, with everything standing. Contrary to the opinion of the captain and mate, his idea is, that if at the time the jib fouled, the anchor had been cast and the sails let go, that the vessel would have been held. In this, Makahi is measurably supported by Capt. Worth, whose view is, that if the anchor had been let go when he first saw the danger, that there would, at all events, have been a better chance for saving the cargo, and perhaps the vessel herself. Makahi also indicates two other modes of casting off from the buoy by which the vessel's safety would have been rendered certain; the first, casting off without any sail on at all, by which she must inevitably have floated out to seaward; or if the line had been passed aft to the taffrail and fastened there from the

buoy before casting off.   Both these modes are denounced by Capt. McGregor and Mr. Fisher as being unseamanlike and likely to expose the master to ridicule ; though Capt. McGregor in his cross examination, admits that it is seamanlike to do what is most for the safety of the vessel, and that he would not make sail, where it would add to the vessel's danger.   And I merely notice here in passing, that he draws a distinction ; that if a square rigged vessel had been in the situation of the " Emma Rooke," she would have made sternway, and got clear of everything.   He also states that the heavy swell spoken of by Fisher is on the rocks, and not at the buoy.   Fisher is positive also that could the jib have been got up, the vessel would have cleared the land, and that if the breeze had not freshened, there would have been no trouble in hoisting it.   On the other hand it is admitted by the master that it was certainly possible to have got the vessel under way without going on shore ; that if no sail had been put on at all, she must have gone out to sea in safety.

Such I conceive to be the essential abstract of the testimony in this branch of the case.   And the all important question here arises before the Court, under the 4th allegation of the libel : was the management of the sails and rudder negligent and unseamanlike ?   Before attempting an answer, I desire to dispose of the matter of law involved.

And first as to what is stated in the 1st Article of the libel, that the schooner " Emma Rooke " was engaged in the coasting or inter-island trade of the Kingdom, and during the aforesaid month of January and for a long time preceding had been, and on the said 18th day of January was, a common carrier of merchandise and passengers between the port of Honolulu and the port of Hilo and other intermediate ports and landings on the weather side of Hawaii.

This allegation is answered by the admission on the part of the respondents, that the said schooner, the " Emma Rooke," was engaged in the coasting and inter-island trade of this Kingdom ; but whether or not as a common carrier, these respondents cannot answer, and allege that she did carry merchandise and passengers between the ports of Honolulu and Hilo and other intermediate ports and landings, not only on the weather

side, but on both sides of the Island of Hawaii, and also to and from ports and landings on the Island of Maui. Without deeming it necessary here to review the testimony on this point, I am satisfied from the proofs, coupled with the above admission, that the "Emma Rooke" was a vessel engaged by her owners in a business which unquestionably in law would fix upon them the denomination of common carriers, liable to all the legal responsibilities which such a denomination incurs.

If such be the character of the trade in which she was engaged, are the respondents in any sense liable for the negligent and unseamanlike management of her master, should it be made to appear, to the extent charged in the 6th Article of the libel, viz : payment for the property lost by the wreck? The general rule of law is clear on this point, and is concisely laid down by Angell in his work on Common Carriers, at Section 91 : "In respect to the acts of *agents* and persons in the employment of a carrier, the maxim *respondet superior* applies, and he is equally liable for their acts and for his own." There are well known qualifications to this general principle, to which the circumstances of the present case make it unnecessary to recur. The authority of the master in this instance has not been questioned.

It was argued by the learned counsel for the respondents, that it was not expedient in this country that the common law in this respect should be adopted to its fullest extent ; that the Court might mitigate the stringency of the rule. In the case of La Motte and Dupertail *vs.* B. F. Angel, United States Consul, before Chief Justice Lee, (Haw. Reports, vol. 1, page 136), although the question of responsibility was not the direct issue before the Court, yet, in deciding what was then before it, the Court appears to have acknowledged the principle as applicable to our status as a commercial community throughout. The rule of the common law, says Bronsen, J., is founded upon a great principle of public policy ; it has been approved by many generations of wise men, and if the Courts were now at liberty to make, instead of declaring the law, it may well be questioned whether they could devise a system which on the whole, would operate more beneficially.

And now as to how far the loss of the vessel may or may not

be attributed to facts or circumstances beyond the power of the master to control.

The ordinary presumption of the common law is rigid against the carrier in every case in making him responsible, excepting only for those acts that could not happen by the intervention of human means, or against which human prudence and sagacity could not guard. Of the cases cited at the argument, two seem to have been equally relied on as authorities by the learned counsel on either side ; but neither of them, in my opinion, so far as their circumstances are concerned, furnish parallels to the case at bar. In the case of Colt and Colt *vs.* M'Mechen (6 Johnson's R., page 159), the sloop was beating up the Hudson River against a head wind ; from the lateness of the season and the fear of ice, the captain was anxious to reach a place of safety, and to which he had nearly arrived when the accident happened, which was the sudden failure of the wind under the shore, by which the vessel run aground.

The other case referred to in 21 Wendell, page 190, McArthur and Hurlbert *vs.* Sears, was that of a steamboat stranded in entering a harbor in the night time, in consequence of the master mistaking a light upon a stranded vessel for the usual beacon light.

In my opinion, the correct principle to be applied to the present case, is ably and clearly stated by Chancellor Kent, upon the consideration by the Court of a motion for a new trial, in the first of the above mentioned cases ; where, after concurring in the general doctrine that the sudden failure of the wind was an act of God, which could not happen by the intervention of man, nor be prevented by human prudence, yet that a degree of negligence was imputable to the master, and that more caution should have been exercised to guard against such a probable event as the want of wind to bring his vessel about. The failure of the wind in that case, is likened unto the sudden puff or gust by which the jib was fouled over the lee anchorstock in the case at bar, and argued to be the sole cause of the calamity.

According to the testimony, sudden puffs of wind were ordinary occurrences at or about that time of the day, at the coming down of the trade winds.

It was not one of those extraordinary events against which no human diligence and foresight could guard.

Again, it is shown that the "Emma Rooke" was a vessel of unusual speed, when impelled by even light winds, and considering such to be the character of the vessel, I think there was a want of caution in having any after sail set, which might tend to urge the vessel's bow up into the wind, regarding also the length of the vessel and the distance between the buoy and the south point, to be for a vessel of her qualities as extremely short, and which is further shown by the very few moments which elapsed from the time the vessel was released from the buoy to the time when she struck. The Captain himself says in reply to a question put by plaintiff's counsel, that even with the mainsail off, helm hard up, jib-sheet to windward, fore-boom guyed to windward, that the vessel would pay off rapidly but still be making headway and not go astern, if wind was abeam or abaft abeam.

Two other methods of getting under weigh are pointed out by the testimony, by which the vessel's safety would have been secured.

I do not purpose to discuss their respective merits; they have been sufficiently adverted to in the recapitulation of the evidence.

But it is furthermore testified to by the master, that it was certainly possible to have got the vessel under weigh without going ashore; and if such be the state of the case, is it possible for the Court to adjudge that the loss of the vessel was the result of inevitable accident, or of circumstances beyond the skill, caution and foresight of the master to have controlled? Upon a careful consideration of the facts and law of the case, I am of opinion that it was not.

The error of judgment, was the bringing of the vessel into such a position that the mere fouling of the jib within so limited a distance, by the puff or gust of wind, rendered it impossible to adopt any other course under so sudden an emergency to ward off the disaster. I should have regarded the case differently, had it been that of a vessel obliged to beat through a passage or channel way in order to regain the open sea, and disappointed suddenly by a change of wind, or a failure thereof;

for in such a case, the making sail and a certain reliance upon the steadiness of the adverse wind is of the essence of the undertaking, namely, to get out of port, but the circumstances of the present case, as shown, were different.

Under this view, and that by the acknowledged rule of law, the respondents are liable for the acts of their agent, the master, when acting in the scope of his duty, my judgment is, that the respondents pay to the libellants the net value at this port of the produce lost by the wreck, which, according to the computation made, with the assistance of the Clerk of the Court, I have ascertained to be $4,574 08½.

Let judgment be entered for the libellants for the above amount and costs.

C. C. Harris, for libellants.

John Montgomery and R. H. Stanley, for respondents.